| | |
|---|---|
| DONA SNYDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 13-461-SLR-SRF |
| | ) |
| HARTFORD LIFE | ) |
| INSURANCE COMPANY | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On March 21, 2013, Dona Snyder ("Plaintiff" or "Snyder"), filed this action against Hartford Life Insurance Company[1] ("Defendant" or "Hartford") pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et seq.* (D.I. 1) Hartford entered into a contract with Hilb, Rogal & Hobbs ("HRH") to provide Long Term Disability ("LTD") benefits for HRH employees. (D.I. 16 at 8; D.I. 20 at 760) HRH employed Snyder. (D.I. 20 at 699) Snyder received LTD benefits effective November 5, 2008 through September 30, 2012. (*Id.* at 84, 19, 255) Snyder claims that Hartford's termination of her LTD benefits as of September 30, 2012 was arbitrary and capricious. (D.I. 1 at 5-6) Currently before the court are the parties cross motions for summary judgment. (D.I. 16; D.I. 18)

---

[1] Defendant Hartford Life and Accident Insurance Company is incorrectly named as Hartford Life Insurance Company by the Plaintiff. (D.I. 19 at 1)

1

The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). For the reasons set forth below, I recommend that the court deny Snyder's motion for summary judgment and grant Hartford's motion for summary judgment.

## II. BACKGROUND

### A. Plan Details

Snyder began working as director of commercial lines for HRH on October 18, 2004. (D.I. 20 at 699) In 2007, HRH contracted with Hartford for a policy ("the Plan") pursuant to which Hartford would fund and administer claims for LTD benefits. (D.I. 16 at 7-8; D.I. 24 at 1; D.I. 20 at 760, 783-84) The Plan grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (D.I. 20 at 783) While the Plan is paid for by HRH, all eligibility decisions are made by Hartford. (*Id.* at 784)

To qualify for LTD benefits under Hartford's LTD plan, a plan participant must be considered "disabled" under the Plan. (*Id.* at 765) To be considered "disabled," a plan participant must be "prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period; and 2) Your Occupation following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings." (*Id.* at 774) "Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." (*Id.* at 778) Under the Plan, LTD benefits will terminate upon a number of factors, including when the plan participant is considered no longer "disabled." (*Id.* at 766-67)

If benefits are terminated, a claimant maintains the right to appeal that decision. (*Id.* at 786-87) Hartford is required to review on appeal "all comments, documents, records and other

2

information submitted by [a plan participant] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." (*Id.*) On appeal, any adverse benefit determination is final and must be in writing. (*Id.* at 787)

Snyder submitted evidence establishing "disability" under the Plan from May 9, 2008 through September 30, 2012. (*Id.* at 81-84, 19-23, 255) Snyder was deemed disabled under the Plan as of May 9, 2008, based on her treating physicians' diagnoses which included fatigue and panhypopituitarism.[2] (*Id.* at 81-82) Snyder began receiving LTD benefits under the Plan effective November 5, 2008, following the policy elimination period.[3] (*Id.* at 84) Snyder's gross monthly salary at the time of her disability was $8,791.67. (*Id.*) The Plan provides for payment of sixty percent of an employee's salary, less certain offsets such as Social Security Disability. (*Id.* at 81) Snyder was approved for Social Security Disability benefits in June 2009. (*Id.* at 6)

### B. Factual Background and Medical History

The present dispute concerns Snyder's claim for benefits under the Plan from September 30, 2012, to date. (D.I. 16; D.I. 18) Hartford notified Snyder by letter dated September 20, 2012, of the termination of her LTD benefits.[4] (D.I. 20 at 19-24) Snyder pursued an appeal of the termination of benefits through a letter dated October 2, 2012. (*Id.* at 252-66) In a letter dated

---

[2] Panhypopituitarism is a condition involving inadequate or absent production of pituitary hormones. *Panhypopituitarism Definition*, Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/panhypopituitarism (last visited Sep. 17, 2015).

[3] Hartford acknowledged Snyder's disability date as May 9, 2008, however the date benefits were effective was not until November 5, 2008. (D.I. 20 at 84) Under the Plan, Snyder had to complete the elimination period (the end of short term disability) before LTD benefits could be awarded. (*Id.*)

[4] Hartford sent the original letter terminating Snyder's benefits on September 20, 2012. (D.I. 20 at 19) On September 24, 2012, Snyder's benefits were extended through September 30, 2012. (*Id.* at 255)

November 16, 2012, Hartford denied Snyder's appeal and notified her of the exhaustion of her administrative remedies. (*Id.* at 1-7)

## 1. Director of Commercial Lines

Snyder was continuously and actively employed as a director of commercial lines for HRH beginning October 18, 2004, through May 9, 2008. (*Id.* at 84, 699, 918) A physical demand analysis completed by Snyder's supervisor, Ann F. Cool, stated that a director of commercial lines position would require a person to be able to work eight hours a day, five days a week. (*Id.* at 695-97) The physical demands require a person be able to sit six hours at a time for a total of six hours per day, stand a half hour at a time for a total of one hour per day, walk one hour at a time for a total of one hour per day, and have the ability to alternate sitting and standing as needed. (*Id.*) The position requires frequent fingering[5] sixty percent of the time, occasional airplane travel one percent of the time, and driving two percent of the time. (*Id.* at 696) The essential duties included evaluating and managing staff, attending weekly meetings with managers and co-employees concerning company goals and quality of service, directing marketing, monitoring work flow, and coordinating sales, marketing, and customer service. (*Id.* at 697)

On November 11, 2010, an Occupational Analysis report was completed by vocational rehabilitation case manager ("RCM"), Marvin K. Bryant. (*Id.* at 153) The RCM compared the essential duties and corresponding physical demands, environmental conditions, and non-exertional requirements of a director of commercial lines with HRH against the requirements of a Sales Manager as defined and classified in the Dictionary of Occupational Titles ("DOT"). (*Id.*) The essential duties of a director of commercial lines include planning and administering sales

---

[5] The physical demand analysis defined fingering as "fine motor." (*Id.* at 696)

4

policies and programs to accounts. (*Id.*) The RCM could not compare the physical demands of a director of commercial lines, as there were no physical demands noted in the job description he reviewed. (*Id.*) Environmental conditions required working in moderate noise. (*Id.*) Non-exertional requirements included "directing, controlling, planning, dealing with people, coordinating, computing, compiling, copying, comparing, supervising, serving, taking instructions-helping, speaking-signaling, negotiating, etc." (*Id.*)

Based on the nature of the job, the RCM concluded that the essential duties, environmental conditions, and non-exertional requirements of a director of commercial lines and a sales manager are generally equal. (*Id.*) Although the physical demands could not be compared, the RCM noted that the DOT indicates the occupation of a sales manager is sedentary and requires occasional reaching, frequent handling, fingering, talking, hearing and near acuity. (*Id.*)

In her appeal letter on October 2, 2012, Snyder informed Hartford that her job as director of commercial lines at HRH included additional duties not listed in the September 20, 2012 denial letter. (*Id.* at 256) Those additional duties consisted of traveling twenty percent of the time, public speaking fifteen percent of the time, and working over fifty hours per week on a consistent basis. (*Id.*)

### 2. Snyder's Medical History

Snyder is presently 60 years old. (*Id.* at 889) In March of 1988, Snyder had surgery for a non-secreting pituitary tumor. (*Id.* at 258) Since the time of the surgery, Snyder has suffered from panhypopituitarism and diabetes insipidus. (*Id.* at 258-65) The symptoms Snyder complains of

5

include panhypopituitarism, IgG deficiency,[6] urinary tract infections, osteoarthritis, irritable bowel syndrome, fatigue, weakness, depression, and anxiety. (*Id.*) These symptoms rendered Snyder "disabled" under the Plan in May of 2008, and she received LTD benefits from Hartford terminating on September 30, 2012. (*Id.* at 81-84, 19, 255)

On May 9, 2008, Snyder stopped working and was examined by her primary physician, Eva Geracimos, M.D., for symptoms of fatigue and dehydration. (*Id.* at 899) From May 2008 through the Fall of 2008, Dr. Geracimos identified Snyder's primary diagnosis as fatigue with a secondary diagnosis of panhypopituitarism. (*Id.* at 649, 647, 645, 644, 642, 641) Snyder's additional diagnoses included diabetes mellitus and diabetes insipidus. (*Id.*) In response to these diagnoses, Dr. Geracimos imposed varying restrictions ranging from near immobility to relaxed restrictions allowing Snyder to work part-time. (*Id.* at 650, 877)

On October 9, 2008, Snyder met with Steven M. Dellose, M.D., an orthopedist, regarding knee pain. (*Id.* at 854) X-rays taken revealed end-stage osteoarthritis in Snyder's right knee and less severe osteoarthritis in her left knee. (*Id.*)

On December 9, 2008, Snyder was admitted to the hospital for a period of three days due to nausea, vomiting, and diarrhea. (*Id.* at 845)

On January 13, 2009, Hartford approved Snyder's claim for LTD benefits with an effective date of November 5, 2008. (*Id.* at 81-84)

On January 18, 2010, Snyder visited Dr. Geracimos with symptoms of fatigue, swelling in her extremities, and changes in her bowels. (*Id.* at 521) Snyder again visited Dr. Geracimos on

---

[6] The IgG deficiency claim made by Snyder relates to a compromised immune system. (*Id.* at 259)

6

April 12, 2010. (*Id.* at 517) Snyder reported a brief illness while traveling, but her condition had stabilized. (*Id.*) On May 17, 2010, Snyder saw Dr. Geracimos due to suffering a bout of diarrhea for the previous three weeks, weakness, and weight loss. (*Id.* at 515)

On July 19, 2010, Snyder was admitted to the hospital with symptoms of dehydration, diarrhea, hypopituitary issues, and diabetes insipidus. (*Id.* at 584) During her hospital stay, Snyder was seen by Ragu Sanjeev, M.D., Amy Wachter, M.D., and Kirsten Hauer, M.D. (*Id.* at 587-96) Dr. Sanjeev saw Snyder for her diarrhea and found her abdomen to be soft with mild discomfort in the lower abdomen. (*Id.* at 595-96) Dr. Watcher saw Snyder for her panhypopituitarism and noted that Snyder's bowel issues caused her to lose twenty-two pounds over a three week period, but her diagnosis was that Snyder's panhypopituitarism and diarrhea were unrelated. (*Id.* at 587-88) Dr. Hauer saw Snyder for an infectious disease evaluation, finding Snyder to have hypoactive bowel sounds and her abdomen to be tender to palpation, but no infectious disease was diagnosed. (*Id.* at 590-91) Snyder's final diagnoses upon discharge on July 21, 2010, were acute gastroenteritis, panhypopituitarism, hypokalemia, hypercholesterolemia, gastroesophageal reflux disease, depression, obesity, and a mild urinary tract infection. (*Id.* at 593)

Snyder had another admission to the hospital on August 14, 2010, with initial diagnoses of fainting, panhypopituitarism, and adrenal insufficiency. (*Id.* at 579) Snyder was evaluated for her chronic diarrhea by Ashesh Modi, M.D., on August 15, 2010. (*Id.* at 577) Dr. Modi concluded Snyder's diarrhea had largely resolved at that point and recommended a colonoscopy to rule out possible microscopic colitis and other colon issues. (*Id.* at 578)

7

On August 17, 2010, Dr. Modi performed an upper gastrointestinal endoscopy on Snyder that showed she had gastritis.[7] (*Id.* at 575) Snyder's final diagnoses upon discharge were acute gastritis without hemorrhage, diarrhea, diabetes mellitus, panhypopituitarism, and adrenal insufficiency. (*Id.* at 573)

On September 10, 2010, Snyder had a third admission to the hospital for diarrhea, weakness, and dizziness. (*Id.* at 564) Snyder was found to have clostridium difficile colitis ("C. difficile")[8] and a possible urinary tract infection, however, both improved with antibiotic treatments. (*Id.* at 559-60) On October 6, 2010, Snyder saw Dr. Geracimos who noted the new diagnosis of C. difficile and that Snyder had continued to improve with antibiotics. (*Id.* at 506)

On October 12, 2010, Snyder saw Ira Lobis, M.D., complaining of diarrhea for the past six days which was improving. (*Id.* at 549) Dr. Lobis noted Snyder's symptoms improved while on antibiotics with some intermittent episodes still occurring. (*Id.*) Rehydration and cortisone doses also seemed to help resolve her diarrhea. (*Id.*)

Following her three hospital admissions in 2010, Snyder consulted with a Johns Hopkins' physician, Dr. Roberto Salvatori, on October 26, 2010 and April 12, 2011. (*Id.* at 380-84) Dr. Salvatori reviewed Snyder's history noting that her hospital admissions usually started with dizziness and diarrhea evolving into "full adrenal crisis." (*Id.* at 382) These symptoms required medications, such as intravenous steroids and fluids in response to dehydration. (*Id.* at 382) Dr.

---

[7] Gastritis is inflammation of the stomach lining. *Gastritis Definition*, Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/gastritis (last visited Sep. 17, 2015)

[8] Clostridium difficile colitis is a bacteria that causes swelling and irritation of the large intestine or colon, often leading to diarrhea. *Clostridium Difficile Definition*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/c-difficile/basics/definition/con-20029664 (last visited Sep. 17, 2015)

Salvatori agreed with the treatment plans of prior treating physicians, increasing Snyder's steroid dose to see if it would help prevent her adrenal crisis. (*Id.*) In his notes from Snyder's office visit on April 12, 2011, Dr. Salvatori noted that Snyder seemed to be doing well with steroids and an intake of pickle juice helped with dehydration. (*Id.* at 380) Dr. Salvatori felt that diet and weight loss was a factor in her significant improvement. (*Id.*) During this visit Snyder expressed reservations to Dr. Salvatori about taking an airplane flight to Georgia, however, it did not prevent her from making the trip. (*Id.*)

On March 30, 2011, Snyder saw Dr. Geracimos claiming that she had three episodes of gastrointestinal distress since her last visit in January. (*Id.* at 437) Dr. Geracimos reported that Snyder was able to avoid hospitalization by drinking pickle juice. (*Id.*) Snyder was also doing well managing her knee pain as a result of wearing braces on both knees, but she had begun experiencing low back pain daily. (*Id.*)

On September 3, 2011, Snyder was admitted to the hospital with complaints of diarrhea and abdominal cramping. (*Id.* at 363) She tested negative for C. Difficile, received intravenous fluids which improved her symptoms, and was discharged on September 4, 2011. (*Id.*) On September 28, 2011, Snyder saw Dr. Geracimos without any gastrointestinal complaints or symptoms. (*Id.* at 338)

On October 15, 2011, Snyder was admitted to the hospital with complaints of painful urination and pain in her right side for two weeks, she developed cramping abdominal pain and diarrhea the day before. (*Id.* at 354) Snyder's diarrhea improved with intravenous saline treatment. (*Id.* at 355)

9

Snyder saw Dr. Geracimos in a follow-up appointment on October 31, 2011, and no gastrointestinal symptoms were mentioned. (*Id.* at 335) Dr. Geracimos provided an Attending Physician's Statement of Continued Disability ("APS") and reported in the APS that Snyder suffers from panhypopituitarism, fatigue, and can become easily dehydrated. (*Id.* at 323) Dr. Geracimos noted that Snyder was well hydrated at the time and her physical exam was normal. (*Id.*) Under the physical capabilities portion of her APS, Dr. Geracimos indicated that Snyder could sit for one hour at a time for three hours per day, stand for fifteen minutes at a time for one hour per day, and walk for one half hour at a time for one half hour per day. (*Id.* at 324) Additionally, Dr. Geracimos indicated Snyder could occasionally lift or carry up to twenty pounds, reach above her shoulders, reach at and below her waist, bend at her waist, drive, and frequently finger. (*Id.*) Dr. Geracimos reported that Snyder should be restricted from kneeling and crouching. (*Id.*) These restrictions were noted to be chronic and lifelong. (*Id.*)

On December 13, 2011, Snyder saw Valerie West, M.D. (*Id.* at 347) Dr. West noted that Snyder had been doing well since her October hospitalization and had discontinued using DDAVP.[9] (*Id.*) Dr. West also noted that Snyder's diabetes mellitus had resolved with weight loss. (*Id.*)

### 3. Referral of Snyder's Claim to the Claim Investigation Unit

In March 2012, Snyder's case was referred to Hartford's Claim Investigation Unit (the "CIU"). (*Id.* at 918) Hartford conducted an investigation to determine whether Snyder was engaged

---

[9] DDAVP is an antidiuretic hormone. *Desmopressin Definition*, Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/desmopressin (last visited Sep. 17, 2015).

in greater exertional activities inconsistent with the physical restrictions placed upon her by her treating physician. (*Id.*) The restrictions were that Snyder could only sit for three hours total per day, stand for one hour and walk for a half hour. (*Id.*) However, Snyder had lost a considerable amount of weight and reportedly attended a fitness center regularly. (*Id.*) The CIU recommended surveillance of Snyder in order to independently verify Snyder's activities. (*Id.* at 918, 920-34)

In July 2012, Hartford found that Snyder's medical records reflected significant weight loss, participation in aquatic therapy, air travel without dehydration and adrenal crisis, and fewer complaints of fatigue. (*Id.* at 319) Therefore, Hartford requested additional information from Dr. Geracimos regarding the basis for further physical restrictions on Snyder in light of her improved medical status. (*Id.* at 319-20) Dr. Geracimos responded that the restrictions increased because of worsening arthritis. (*Id.* at 319) Dr. Geracimos did not believe that Snyder could work full-time due to the need for frequent breaks to use the restroom. (*Id.* at 320) Dr. Geracimos felt that a continuous work schedule would wear Snyder down over time. (*Id.*)

## 4. Snyder's Claim Referred to Four Independent Reviewing Physicians

In order to determine the extent of Snyder's functional capabilities, Hartford referred Snyder's medical records to four independent reviewing physicians. (*Id.* at 4-6, 22-23)

### a. A. Wayne Meikle, M.D.

On September 18, 2012, Dr. A. Wayne Meikle, board certified in endocrinology, completed a peer review report of Snyder's records. (*Id.* at 302-08) Specifically, Dr. Meikle reviewed Snyder's job description, hospital records, clinical notes from various treating physicians, Snyder's Social Security Disability application, and the APS forms from Dr. Geracimos. (*Id.* at 302-05) Dr. Meikle spoke with Dr. Geracimos on the phone. (*Id.* at 305) Dr.

11

Geracimos informed Dr. Meikle that Snyder's physical symptoms had improved and she felt Snyder could work full-time at a job where she had the flexibility to get up and walk around as needed. (*Id.*) Dr. Geracimos felt that Snyder was not physically limited or restricted. (*Id.*) Dr. Hauer, an infectious disease specialist, consulted with Snyder regarding her symptoms and informed Dr. Meikle that Snyder had no restrictions or limitations. (*Id.* at 305-06, 350-52, 590-92)[10]

Dr. Meikle concluded that Snyder's medical records no longer supported limitations and restrictions from full-time work. (*Id.* at 307) Snyder maintained the functional capability to perform full-time sedentary work without lifting more than twenty pounds. (*Id.* at 306) Dr. Meikle noted that Snyder was able to sit, stand and walk at intervals of one to two hours. (*Id.*)

#### b. James Lambur, M.D.

On November 7, 2012, James Lambur, M.D., board certified in orthopedic surgery, completed an orthopedic medical review of Snyder's records. (*Id.* at 218-25) Specifically, Dr. Lambur reviewed clinical notes from various treating physicians, x-rays, an MRI, hospital records, and a claimant statement. (*Id.* at 219-20) Dr. Lambur also spoke on the phone with Dr. Dellose on October, 30, 2012. (*Id.* at 220-21) Dr. Dellose informed Dr. Lambur that from an orthopedic standpoint Snyder can engage in full-time sedentary type work with restrictions of lifting no more than ten pounds, limited ambulation, no crawling or stooping, and limitations on sitting or standing four hours a day at one time throughout an eight hour work day. (*Id.* at 220)

---

[10] Dr. Meikle also reached out to Dr. Salvatori, however, Dr. Salvatori would not speak with him without a signed authorization from Snyder. (*Id.* at 305)

12

Dr. Lambur concluded that Snyder could reasonably maintain work activities for eight hours per day forty hours per week. (*Id.* at 225) Dr. Lambur noted that the duties Snyder could perform should not require prolonged periods of standing in excess of two hours at a time and should allow for positional change as needed. (*Id.*) However, Snyder should be restricted from crawling, stooping, and lifting over twenty pounds. (*Id.*)

#### c. Charles Bliss, M.D.

On November 7, 2012, Charles Bliss, M.D., board certified in gastroenterology, completed a gastroenterology medical review of Snyder's medical records. (*Id.* at 209-17) Dr. Bliss reviewed Dr. Geracimos' medical records and spoke with Dr. Geracimos on November 1, 2012.[11] (*Id.* at 210-15) Dr. Geracimos reported to Dr. Bliss that Snyder could work full-time on a reasonable and consistent basis as long as she had ready access to a bathroom. (*Id.* at 215) Dr. Geracimos also reported that during severe bouts of diarrhea Snyder would be unable to work. (*Id.*)

Dr. Bliss concluded that Snyder has irritable bowel syndrome, suffers from chronic intermittent diarrhea, and likely has several flares of active disease per year. (*Id.*) These symptoms were most severe in 2010, but have since occurred less frequently. (*Id.* at 216-17) Dr. Bliss reported that Snyder retains the functional capability to work full-time at the sedentary level. (*Id.* at 216) Dr. Bliss reported that Snyder could work eight hours per day, forty hours per week, provided that she had ready access to the bathroom. (*Id.*) Dr. Bliss noted that Snyder needs reasonable accommodations during episodes of severe diarrhea and that it is reasonable that she not be

---

[11] Dr. Bliss also spoke with Dr. Lobis on November 6, 2012, however, Dr. Lobis noted he has not seen Snyder in two years and had no new information to provide. (*Id.* at 215)

13

expected to work during these episodes. (*Id.* at 216-17) Based on prior patterns, Dr. Bliss expected two or three severe diarrhea episodes per year. (*Id.* at 217)

### d. Robert Cooper, M.D.

On November 7, 2012, Robert Cooper, M.D., board certified in endocrinology and internal medicine, completed an endocrinology review of Snyder's medical records. (*Id.* at 203-08) Specifically, Dr. Cooper noted Dr. Salvatori's records indicating Snyder has a history of panhypopituitarism and diabetes dating back to 1998, and that Snyder had ongoing episodes of diarrhea evolving into adrenal crisis. (*Id.* at 205) Dr. Cooper reviewed treating physicians' notes, APS forms, and hospital records. (*Id.* at 204) Dr. Cooper made particular note of reviewing Dr. Geracimos' October 18, 2012, letter regarding Snyder's appeal. (*Id.* at 205) Dr. Cooper also spoke with Dr. Geracimos on October 31, 2012. (*Id.* at 206) Dr. Geracimos reported that Snyder's medical status was much improved and there were no findings suggesting restrictions and limitations on an ongoing basis. (*Id.*)

Dr. Cooper concluded that Snyder maintains the functional capability to perform work activities for eight hours per day, forty hours per week, on a sustained basis. (*Id.* at 208) From an endocrine standpoint, Dr. Cooper did not report any restrictions or limitations on Snyder's functional capability. (*Id.* at 207-08)

### 5. Termination of Benefits

On September 20, 2012, Hartford advised Snyder that she no longer met the definition of "disability" under the Plan. (*Id.* at 19) Hartford concluded that the review of Snyder's medical information indicated that Snyder can sit for six hours at a time for a total of six hours per day, stand a half hour at a time for a total of one hour per day, walk one hour at a time for a total of one

14

hour per day, and frequently finger. (*Id.* at 23) Hartford explained in the termination letter that they relied in part on the opinion of Dr. Meikle who confirmed with Dr. Geracimos that even with the limitations placed on total standing, sitting, and walking, Snyder could work full-time if she had the flexibility to get up and walk around when needed. (*Id.* at 22) Dr. Geracimos also reported to Dr. Meikle that Snyder was not physically limited by her arthritis and that Snyder's various conditions were being well managed and under good control. (*Id.*) Dr. Meikle concluded that Snyder's condition had improved to the point where she could again perform the essential duties of her former occupation. (*Id.* at 23)

## 6. Appeal of Hartford's Decision

On October 2, 2012, Snyder appealed Hartford's decision to terminate her benefits. (*Id.* at 252-53) Snyder claimed to be disabled by panhypopituitarism, IgG deficiency, urinary tract infections, osteoarthritis, irritable bowel syndrome, fatigue, weakness, depression, and anxiety. (*Id.* at 258-64) Snyder disputed Dr. Meikle's findings including the conversation Dr. Meikle had with Dr. Geracimos regarding Snyder's ability to work. (*Id.* at 254) Snyder also claimed that the essential duties of her specific job as director of commercial lines at HRH exceed those duties identified for her occupation by Ms. Cool. (*Id.* at 256) Snyder claimed that her specific job duties required travel, public speaking, and working over fifty hours per week. (*Id.*)

On October 8, 2012, Dr. Geracimos wrote a letter to Hartford, which included a copy of Snyder's appeal letter. (*Id.* at 235-48) Dr. Geracimos endorsed Snyder's appeal and advocated that Snyder could not hold a permanent position with any company. (*Id.* at 235) Dr. Geracimos further stated that Snyder is "very susceptible to illness and any physical or emotional stressor can cause an imbalance to her hormones which in turn leads to worsening symptoms." (*Id.*) Dr. Geracimos further indicated that Snyder's symptoms often include extreme fatigue and diarrhea, which is

15

often significant enough to dehydrate her to the point where she requires hospitalization, and that these episodes occur several times a year. (*Id.*) Dr. Geracimos reported that Snyder's most recent hospital admission for dehydration following diarrhea had occurred on October 5 to October 6, 2012. (*Id.*)

On November 16, 2012, Hartford denied Snyder's appeal. (*Id.* at 1) Hartford determined that the information available in Snyder's claim file supports the prior determination to terminate her LTD benefits. (*Id.* at 1-7) Hartford determined the medical evidence showed that Snyder maintained the functional capability to perform full-time sedentary type work in her occupation as it is recognized in the general workplace. (*Id.* at 6)

## III.    STANDARD OF REVIEW

### A. Summary Judgment Standard

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are material, and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the

16

light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## B. ERISA Standard of Review

ERISA allows a beneficiary to bring a civil action against an administrator or fiduciary to recover benefits due under the terms of a benefit plan. *See* 29 U.S.C. § 1132(a)(1)(B).[12] Courts should review a denial of insurance benefits "under a *de novo* standard" unless the plan grants discretionary authority. *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). If a plan grants discretionary authority to an administrator or fiduciary, a court must apply the arbitrary and capricious standard when reviewing administrative decisions. *See id.* Under this standard, the plaintiff has the burden of showing that the administrator's denial of benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law" using the evidence available to the administrator at the time of the decision. *Johnson v. UMWA Health & Ret. Funds*, 125 F. App'x. 400, 405 (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and capricious

---

[12] The statute states: "A civil action may be brought—(1) by a participant or beneficiary—... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

17

review of ERISA benefits denial is the record made before the plan administrator which cannot be supplemented during litigation."). "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000) (citation omitted). Thus, when the plaintiff disputes benefit denial under ERISA where a plan grants discretionary authority, the court's task is to determine "whether or not, based on the undisputed administrative record, [the administrator's] decision was an abuse of discretion." *Malin v. Metro. Life Ins. Co.*, 845 F. Supp. 2d 606, 611–12 (D. Del. 2012) (quoting *Kao v. Aetna Life Ins. Co.*, 647 F. Supp. 2d 397, 409 (D.N.J. 2009)); *see also Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x. 266, 270 (3d Cir. 2006).

## IV. DISCUSSION

Snyder asserts that it was arbitrary and capricious for Hartford to terminate her LTD disability benefits. (D.I. 17 at 10-13) The parties are in agreement that the Plan granted Hartford discretionary authority in determining claim eligibility. (D.I. 16 at 8; D.I. 24 at 1) Because of that authority, the court must review Hartford's decision to deny benefits under the arbitrary and capricious standard using only the evidence available to Hartford at the time of the decision. *See Glenn*, 554 U.S. at 111.

Snyder argues that Hartford had an inherent conflict of interest as Hartford both determined claim eligibility and issued benefits. (D.I. 17 at 10-13) In support of this argument, Snyder identifies three reasons why summary judgment is appropriate under the arbitrary and capricious standard: 1) Hartford selectively considered Snyder's available medical evidence; 2) Hartford failed to consider the job requirements of Snyder's own occupation as a director of commercial

18

lines; and 3) Hartford's decision to deny Snyder's disability benefits is not supported by medical information, facts, and evidence in Hartford's administrative record. (D.I. 17 at 13-20) In addition, Snyder believes she is statutorily entitled to an award of attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). (*Id.* at 20-21)

## A. Conflict of Interest

In *Firestone*, the Supreme Court identified the possibility of a structural conflict of interest in situations where the same entity makes claim decisions and pays out benefits. *See Glenn*, 554 U.S. at 112 (citing *Firestone*, 489 U.S. at 105). To account for such conflicts, a court reviewing claim denials should treat any potential conflict as a factor in its analysis. *Glenn*, 554 U.S. at 117. The reviewing court can give this factor more or less weight depending on the likelihood that the conflict actually affected the administrator's decision. *Id.* Thus, while the conflict of interest does not alter the standard of review, it constitutes a factor that a court must evaluate in making its decision.

Hartford admits to a structural conflict identified by the Supreme Court. *See id.* at 115. That is, Hartford makes claim determinations and funds benefits to eligible claimants. (D.I. 16 at 8; D.I. 24 at 1; D.I. 20 at 783)

Snyder provides no factual support that suggests Hartford's decision to terminate Snyder's benefits was influenced by a structural conflict. Hartford obtained and relied on the opinions of four independent reviewing physicians who reviewed the administrative record and supported the conclusion that Snyder was no longer disabled under the Plan. (D.I. 20 at 4-6, 22-23) Hartford considered all relevant material incorporated in the administrative record, which included medical records, notes, letters, and additional material submitted by Snyder and her primary care physician.

19

(*Id.* at 1-7) Hartford also considered Snyder's most recent hospitalization in October 2012. (*Id.* at 4) Based on its review of the claims file, Hartford concluded that Snyder was no longer "disabled" as defined in the Plan.[13] (*Id.* at 6)

Snyder's criticisms of Hartford's investigation of her claim, including surveillance and independent medical reviews in lieu of physical examinations, do not amount to arbitrary and capricious conduct and do not violate the terms of the Plan. (D.I. 17 at 14; D.I. 20 at 918, 756-89) Plaintiff fails to substantiate that a conflict of interest influenced the outcome of Hartford's claim determination. Therefore, this factor does not weigh in favor of finding that Hartford's decision to terminate LTD benefits was arbitrary and capricious.

## B. Available Medical Evidence

Snyder next argues that Hartford selectively considered the available medical evidence in making the determination to terminate Snyder's LTD benefits. (D.I. 17 at 13-17)

Plan administrators may not selectively consider and credit medical opinions without articulating the reasoning for doing so. *Ricca v. Prudential Ins. Co. of Am.*, 747 F. Supp. 2d 438, 445 (E.D. Pa. 2010). Where LTD benefit plans grant a party complete discretion to weigh conflicting medical evidence and render a decision, awarding more credit to certain medical

---

[13] Multiple courts in other jurisdictions have reviewed Hartford's structure and concluded that Hartford's decisions regarding awarding and terminating benefits were not affected by any conflict of interest. *See Hunley v. Hartford Life & Accident Ins. Co.*, 712 F. Supp. 2d 1271, 1284 (M.D. Fla. 2010) (deciding that Hartford's decision to award and terminate benefits was not affected by a conflict of interest); *see also Miller v. The Hartford Life & Acc. Ins. Co.*, No. 1:08-CV-2014-RWS, 2010 WL 1050006, at *11 (N.D. Ga. Mar. 17, 2010) (concluding that Hartford took several steps to reduce any potential bias and promote accuracy in determining whether benefits should be awarded); *see also Frost v. Hartford Life & Acc. Ins. Co.*, No. CIV. 09-CV-120-SM, 2010 WL 335507, at *11 (D.N.H. Jan. 28, 2010) (describing that "Hartford's decisions were not influenced by financial concerns and were, instead, based solely on [plaintiff's] medical records and the videos showing her physical disabilities.").

20

evidence over others "is not evidence of abuse of discretion." *Fisher v. Aetna Life Ins. Co.*, 890 F. Supp. 2d 473, 484 (D. Del. 2012). Nothing in ERISA itself "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Thus, a plan administrator is "justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision to do so." *Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209, 212 (3d Cir. 2003). However, "plan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834.

## 1. Hartford's Review of Medical Records

Hartford based the termination of Snyder's LTD benefits upon the review of all medical information in Snyder's claim file. (D.I. 20 at 1-7, 20-24) These records included reports from Snyder's primary care physician, Dr. Geracimos, including the October 8, 2012, letter in support of Snyder's appeal. (*Id.* at 1) In addition to Dr. Geracimos' reports, Hartford reviewed reports from Snyder's various treating specialists which noted improvements in Snyder's condition. Dr. Salvatori, Snyder's pituitary specialist, noted that Snyder was taken off her insulin and was able to control her diabetes with her diet. (*Id.* at 380) Dr. Salvatori also reported that Snyder was purchasing bottles of pickle juice and focusing on staying hydrated which had significant impacts on her lifestyle. (*Id.*) Dr. West, Snyder's endocrinologist, noted an improvement in Snyder's conditions since the October 15, 2011, hospitalization and the discontinuance of DDAVP. (*Id.* at 347) Dr. West also noted that Snyder's diabetes mellitus had resolved with weight loss. (*Id.*) In a conversation with Dr. Meikle on August 29, 2012, Dr. Hauer discussed Snyder's consultation for possible immune deficiency. (*Id.* at 306) Dr. Hauer reported no physical limitations or restrictions

21

relating to an immune deficiency that would keep Snyder from working full-time. (*Id* at 305-06, 350-52) Dr. Dellose, Snyder's treating orthopedist, discussed with Dr. Lambur that Snyder is able to engage in full-time work at the sedentary level with reasonable restrictions. (*Id* at 220)

In addition to the four treating specialists and other medical evidence in Snyder's claim file, Hartford relied on the peer reviews completed by Dr. Meikle, Dr. Lambur, Dr. Bliss, and Dr. Cooper. (*Id* at 4-6, 22, 306-08, 224-25, 216-17, 207-08) The peer reviewing physicians reviewed all available medical evidence and information in Snyder's claim file. (*Id* at 4-6, 22) Some of the peer reviews included information obtained from contacting Snyder's treating specialists and primary care physician. (*Id* at 305-06, 215) All four peer reviewing physicians came to the conclusion that Snyder maintained the functional capacity to perform full time sedentary work. (*Id* at 306-08, 224-25, 216-17, 207-08)

## 2. Snyder's Primary Care Physician's Opinion

Snyder argues that Hartford ignored and misrepresented Snyder's medical records, in particular Dr. Geracimos' opinion.[14] (D.I. 17 at 14) However, Dr. Geracimos' opinions as to Snyder's functional capabilities are far from consistent. (*Id* at 637-38; 386-87) For example, the APS form completed by Dr. Geracimos on October 6, 2010, lists subjective symptoms of fatigue, weight loss, and diarrhea. (*Id* at 637-38) Dr. Geracimos noted a primary diagnosis of panhypopituitarism and secondary diagnoses of diabetes mellitus and diabetes insipidus. (*Id*)

---

[14] Snyder also argues that Hartford relied on "cold paper review" of the independent reviewing physicians over the physical assessments of Dr. Geracimos. (D.I. 17 at 14) Conducting medical reviews in place of independent medical examinations will not render a decision arbitrary and capricious unless there is a provision in the plan administration agreement specifying that such independent medical examination must take place (there is no such provision here). *Fisher v. Aetna Life Insur. Co.*, 890 F. Supp. 2d 473, 484 (D. Del. 2012) (citing *Marshall v. Connecticut Gen. Life Ins. Co.*, No. CIV.A.2:02 CV 03662, 2005 WL 1463472, at *10 (E.D. Pa. June 17, 2005)).

22

Nevertheless, in the physical examination findings, she recorded findings describing Snyder as "well nourished," "pleasant," and "normal." (*Id.* at 637) Under the functional capabilities section, Dr. Geracimos noted that Snyder can sit for two hours at a time for up to eight hours per day, stand for half an hour at a time for up to two hours, walk for half an hour or less at a time for up to two hours, and carry up to twenty pounds occasionally. (*Id.* at 638) The APS form also notes that Snyder's depression is appropriately controlled. (*Id.*) Moreover, Dr. Geracimos does not respond where the form seeks the provider to state the expected length of time for the duration of any current restrictions or limitations. (*Id.*)

However, in the APS form completed one year later, on October 31, 2011, Dr. Geracimos substantially reduced the number of hours Snyder can sit, stand, or walk in her functional capabilities assessment of Snyder. (*Id.* at 386-87) These changes in functional capabilities were listed despite the lack of change in the primary and secondary diagnoses (the primary diagnosis remained panhypopituitarism and the secondary diagnosis was left blank). (*Id.*) Moreover, the physical exam findings were again reported as "normal." (*Id.* at 386) Dr. Geracimos noted that the expected duration of the restrictions were "chronic/lifelong." (*Id.* at 387)

There is no explanation for the inconsistency in the APS forms completed one year apart, which contain the same normal physical examination findings and the same collection of subjective complaints and diagnoses. (*Id.* at 637-38, 386-87)

Hartford sent a letter to Dr. Geracimos on July 16, 2012, prior to the termination of Snyder's LTD benefits, requesting clarification on why Dr. Geracimos substantially reduced Snyder's functional capabilities. (*Id.* at 319-20) In this letter, Hartford discussed the improvement reported in Snyder's symptoms through various treating physicians' notes. (*Id.*) The improvements discussed were that Snyder had engaged in aquatic therapy for exercise, had become more active

23

with a change in medications, had continued with weight loss, and was able to take a flight to visit family without dehydration or an adrenal crisis. (*Id.* at 319-20) In light of the noted improvement, Hartford asked Dr. Geracimos for the basis of the changes in her opinion reducing the hours that Snyder could sit, stand, or walk in the workplace. (*Id.*) The only explanation given by Dr. Geracimos for explaining the reduction in hours was a worsening of Snyder's arthritis for which she wears bilateral knee braces. (*Id.* at 319) However, the basis stated by Dr. Geracimos is not supported by Snyder's treating orthopedist who prescribed the knee braces, Dr. Dellose. (*Id.* at 220) In his conversation with Dr. Lambur regarding Snyder's osteo-arthritic knee pain, Dr. Dellose reported that from an orthopedic standpoint Snyder is not restricted from full-time employment at a sedentary level. (*Id.*)

Without addressing the inconsistencies in Dr. Geracimos' records included within the administrative file, Snyder asks the court to go beyond the closed administrative record to consider a supplemental submission from Dr. Geracimos, a sworn affidavit dated March, 1, 2013.[15] (D.I. 16 at 19-20; D.I. 2, Ex. H) However, the court must review Hartford's decision to deny benefits under the arbitrary and capricious standard using only the evidence available to Hartford at the time of the decision. *See Glenn*, 554 U.S. at 111; *see also* (D.I. 20 at 786-87). Accordingly, the court reviews the termination of LTD benefits based on the information within the administrative record at the time Hartford made its final decision. *Id.* Hartford had no basis to question whether Dr. Meikle, Dr. Bliss, or Dr. Cooper mischaracterized statements made to each of them by Dr. Geracimos. (*Id.* at 305, 215, 206)

---

[15] Snyder first included Dr. Geracimos' affidavit with the complaint commencing suit. (D.I. 2, Ex. H)

Thus, Hartford did not ignore or selectively consider medical evidence. Rather, Hartford afforded controlling weight to the opinions of the reviewing physicians and Snyder's treating specialists over the contradicting opinions of Dr. Geracimos. *Nord*, 538 U.S. at 831. Hartford is "justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision to do so." *Nichols*, 78 F. App'x at 212. Consequently, Hartford sufficiently considered all available medical evidence in making its determination and this factor does not weigh in favor of determining that Hartford's decision was arbitrary and capricious.

## C. Consideration of Appropriate Job Requirements

Snyder next argues that Hartford was incorrect when determining whether she qualified for LTD benefits by reviewing her occupation as a sedentary type desk job. (D.I. 17 at 17-19)

A significant factor in determining whether an administrator's decision is arbitrary and capricious is whether the administrator properly considered the claimant's ability to perform his or her job requirements. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 854 (3d Cir. 2011). Here, the Plan specifically provides that Hartford was required to consider Snyder's ability to perform the job of director of commercial lines "as it is recognized in the general workplace," and not "for a specific employer or at a specific location." (D.I. 20 at 778)

### 1. Job Duties of a Director of Commercial Lines

To define the duties of a director of commercial lines, Hartford reviewed the physical demand analysis completed by Ms. Cool and the occupational analysis completed by the RCM. (*Id.* at 2-3, 695-97, 153) Ms. Cool's analysis outlined that a person working as a director of commercial lines would be required to work eight hours a day, five days a week. (*Id.* at 695) This occupation requires a person to sit six hours at a time, stand a half hour at a time, walk one hour

at a time, with the ability to sit and stand in intervals as needed. (*Id.* at 695-96) This position also included frequent fingering, occasional airplane travel and driving. (*Id.* at 696) The essential duties reported included evaluating and managing staff, participating in weekly meetings with managers and co-employees, directing marketing, monitoring work flow, and coordinating sales, marketing, and customer service. (*Id.* at 697)

The RCM reported that the essential duties of a director of commercial lines are equal to those of a sales manager under the DOT's description and requires one to have the physical capabilities to perform full-time sedentary work. (*Id.* at 153) Other non-exertional requirements included "directing, controlling, planning, dealing with people, coordinating, computing, compiling, copying, comparing, supervising, serving, taking instructions-helping, speaking-signaling, negotiating, etc." (*Id.*)

Snyder argues that her job as director of commercial lines at HRH exceeded those duties identified by Hartford. (D.I. 17 at 18-19; D.I. 20 at 256) Snyder identified additional duties for her occupation consisting of traveling twenty percent of the time, public speaking fifteen percent of the time, and working over fifty hours per week on a consistent basis. (D.I. 20 at 256) However, Snyder's own supervisor, Ms. Cool, confirmed in her physical demand analysis that as a director of commercial lines Snyder was only required to work eight hours per day, five days per week. (*Id.* at 695-96) Air travel was limited to one percent and driving was limited to two percent of the time. (*Id.*) Further, Ms. Cool did not report public speaking as one of the duties of the position of director of commercial lines at HRH. (*Id.* at 697) Public speaking was also not listed among the essential job duties in the RCM's report. (*Id.* at 153)

**2. Ability to Perform the Job Duties of a Director Of Commercial Lines**

26

In analyzing Snyder's ability to perform the job duties of a director of commercial lines as recognized in the general workplace, Hartford compared the information provided by Ms. Cool and the RCM to the functional capabilities assigned to her by the independent reviewing physicians. (*Id.* at 2-6) These included Dr. Meikle's report that Snyder's medical records no longer supported limitations and restrictions from full-time work. (*Id.* at 307, 22-23) Dr. Meikle concluded that Snyder maintained the functional capability to perform full-time sedentary type work without lifting more than twenty pounds with the flexibility to sit, stand, and walk at intervals of one to two hours. (*Id.* at 306-07, 22-23) Dr. Lambur reported that Snyder could reasonably maintain work activities for eight hours per day forty hours per week. (*Id.* at 225, 5) Dr. Lambur noted that the duties Snyder could perform should not require prolonged periods of standing in excess of two hours at a time and should allow for positional change as needed. (*Id.*) However, Snyder should be restricted from crawling, stooping, and lifting over twenty pounds. (*Id.*) Dr. Bliss reported that Snyder retains the functional capability to work full-time at the sedentary level. (*Id.* at 216, 5) Snyder could work eight hours per day, forty hours per week, provided that she had ready access to the bathroom. (*Id.*) Dr. Bliss noted that Snyder needs reasonable accommodation during episodes of severe diarrhea and that it is reasonable that she not be expected to work during these episodes. (*Id.* at 216-17, 5) Finally, Dr. Cooper reported that Snyder maintains the functional capability to perform work activities for eight hours per day, forty hours per week, on a sustained basis. (*Id.* at 208) From an endocrine standpoint, Dr. Cooper did not report any restrictions or limitations on Snyder's functional capability. (*Id.* at 207-08, 6)

Hartford concluded that Snyder maintained the functional capability to perform full-time sedentary work. (*Id.* at 6) Hartford then carefully reviewed the job duties of Snyder's occupation

as director of commercial lines as recognized in the general workplace and found that Snyder could perform those activities as the position is at the sedentary level. (*Id.*)

Snyder argues that Hartford failed to rely on Snyder's specific job duties and instead based its determination on the generic duties of a desk job. (D.I. 17 at 19) Snyder relies on two cases to support her claim that Hartford failed to rely on Snyder's specific job duties. (D.I. 17 at 18-19) In *Heim v. Life Ins. Co. of N. Am.*, the administrator's original termination letter found there was no evidence to support restrictions that would preclude her from performing her "regular occupation" without ever discussing what plaintiff's actual occupation was or the physical demands that it required. No. CIV.A. 10-1567, 2012 WL 947137, at *11 (E.D. Pa. Mar. 21, 2012). In subsequent denial letters, the administrators still failed to discuss plaintiff's occupation and instead designated her job as "medium duty" reviewing only the physical demands of a general "medium duty" job. *Id.* Next, in *Loomis v. Life Ins. Co. of N. Am.*, the court faulted the claim administrator for failing to mention in their denial letter the plaintiff's job requirements or providing any analysis as to whether the plaintiff could perform those requirements. No. CIV.A. 09-3616, 2011 WL 2473727, at *5 (E.D. Pa. June 21, 2011).

Here, Hartford was obligated to review Snyder's job "as it is recognized in the general workplace," and not "for a specific employer or at a specific location." (D.I. 20 at 778) In both the original termination letter and the subsequent appeal denial letter, Hartford correctly identified Snyder's job title as a director of commercial lines and considered the material duties of that position as recognized in the general workplace. (*Id.* at 2-3, 22-23) In contrast to the cases cited by Snyder, Hartford applied the correct standard as it is written in the Plan. (*Id.*) Hartford considered "Your Occupation as it is recognized in the general workplace." (*Id.* at 774, 778, 3); *see Heim*, 2012 WL 947137, at *11 (E.D. Pa. Mar. 21, 2012); *see also Loomis*, 2011 WL 2473727,

28

at *5 (E.D. Pa. June 21, 2011). Hartford adequately compared the job duties as described by Ms. Cool and the RCM to the functional capabilities assigned by the independent reviewing physicians. (D.I. 1-7)

Thus, Hartford sufficiently considered the appropriate job description in determining that the evidence no longer supported Snyder's inability to perform the duties of a director of commercial lines as seen in the general workplace. (D.I. 20 at 2-3) Therefore, Hartford's decision to terminate LTD benefits was not arbitrary and capricious.

### D. Attorney's Fees

Snyder request an award of attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). The statute allows for reasonable attorney's fees and costs to be awarded to either party. (D.I. 17 at 20-21) As each of the arguments Snyder asserts regarding Hartford's decision to terminate her benefits does not support a finding that Defendant's claim determination was arbitrary and capricious, I recommend the request for attorney's fees be denied.

### V. CONCLUSION

For the foregoing reasons, I recommend that the court deny Snyder's motion for summary judgment and grant Hartford's motion for summary judgment.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de

29

novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: September 18 , 2015

Sherry R. Fallon
United States Magistrate Judge